**NO. 24-11540-F**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

**UNITED STATES OF AMERICA,**
***Plaintiff/appellee,***

**v.**

**GENO ST. FLEROSE,**
***Defendant/appellant.***

**On Appeal from the United States District Court**
**for the Southern District of Florida**

# BRIEF OF THE APPELLANT
# GENO ST. FLEROSE

**Hector L. Flores**
**Attorney for Appellant**
**Geno St. Flerose**
**40 N.W. Third Street, Penthouse 1**
**Miami, Florida 33128**
**Telephone No. (305) 374-3998**

**THIS CASE IS ENTITLED TO PREFERENCE**
**(CRIMINAL APPEAL)**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

**United States v. Geno ST. Flerose
NO. 24-11540-F**

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Becerra, Hon. Jacqueline

Bloom, Hon. Beth

Carames, Dianne

Dodin, Yara

Fajardo Orshan, Ariana

Flores, Hector L.

Friedman, Jonathan S.

Gonzalez, Juan Antonio

Hernandez, Christine

Hyman, Mitchell Evan

Kirkpatrick, Lynn

Lapointe, Markenzy

Louis, Hon. Lauren Fleischer

Matzkin, Daniel

McAliley, Hon. Chris M.

McLaughlin, Sean Thomas

O'Donnell, John Francis

O'Sullivan, Hon. John J.

Otazo-Reyes, Hon. Alicia M.

Reid, Hon. Lisette M.

Shadley, Frederic

Silverstein, Joan

St. Flerose, Geno

Stone, Emily Rose

Torres, Hon. Edwin G.

Vora-Puglisi, Sabrina D.

Counsel certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

The defendant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

STATEMENT REGARDING ORAL ARGUMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF CITATIONS ........ iv

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

Course of Proceedings and Disposition in the District Court ........ 3

Statement of Facts ........ 6

STANDARDS OF REVIEW ........ 11

SUMMARY OF THE ARGUMENT ........ 13

ARGUMENT AND CITATIONS OF AUTHORITY ........ 14

**I. Whether, based upon the totality of the circumstances, this Court should find that Mr. St. Flerose's statements to law enforcement were involuntary and should have been suppressed.**

CONCLUSION ........ 23

CERTIFICATE OF COMPLIANCE ........................................................................ 24

CERTIFICATE OF SERVICE............................................................................... 25

## TABLE OF CITATIONS

**CASES:**

*Becker v. Kroll*,

964 F3rd 904 (10th Cir. 2007) .......................................................... 16

*Blackburn v. Alabama*,

361 U.S. 199(1960)............................................................................ 19,

*Clanton v. Cooper,*

129 F3rd 1147 (10th Cir. 1997)........................................................... 16

*Harris v. Dugger*,

874 F2nd 761 (11th Cir. 1989).............................................................. 20

*Hubbard v. Haley*,

317 F3rd 1245(11th Cir. 2003) ........................................................... 9

*Jackson v. Denno*,

378 U.S. 368 (1964)............................................................................ 15

*Mincey v. Arizona*,

437 U.S. 385 (1997)............................................................................ 15

*Becker v. Kroll*,

964 F3rd (10th Cir. 2007) ...................................................................... 16

*Miranda v. Arizona*,

348 U.S. 436 (1966)........................................................................ 11

*Missouri v. Seibert*,

542 U.S. 608 (2004)........................................................................ 15

*Schnekloth v. Bustamante*,

412 U.S. 218 (1973)........................................................................ 15

*Spano v. New York*,

360 U.S. 315 (1959)........................................................................ 18

*Thompson v. Keohane*,

516 U.S. 99 (1995).......................................................................... 16

*United States v. Garot*,

801 F.2nd 1241, (10th Cir. 1986)...................................................... 16

*United States v. Hollis*,

780 F.2nd 1064, (11th Cir. 2015)........................................................ 9

*United States v. Lall*,

607 F.3rd 1277, (11th Cir. 2010)....................................................... 10

*United States v. Rodebaugh*,

798 F.3d 1281, (10th Cir. 2018)......................................................... 17

*United States v. Tingle*,

658 F.2nd 1132, (9th Cir. 1981)......................................................... 11

*United States v. Young*,

964 F.3d 938, (10th Cir. 2020) ........................................................ 16

## STATUTORY AND OTHER AUTHORITY:

18 U.S.C. § 111 .......... 3

18 U.S.C. § 922 .......... 3

18 U.S.C. § 924 .......... 3

18 U.S.C. § 1028 .......... 4

18 U.S.C. § 1029 .......... 4

18 U.S.C. § 1959 .......... 3

18 U.S.C. § 3742 .......... 1

18 U.S.C. § 3231 .......... 1

28 U.S.C. § 1291 .......... 1

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with offenses against the laws of the United States. The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on May 8, 2024, from the final judgment and commitment order entered in the district court on March 3, 2024, that disposes of all claims between the parties to this cause.

## STATEMENT OF THE ISSUES

**Whether, based upon the totality of the circumstances, this Court should find that Mr. St. Flerose's statements to law enforcement were involuntary and should have been suppressed.**

## STATEMENT OF THE CASE

The appellant was the defendant in the district court and will be referred to by name or as the defendant. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the district court docket entry number ("DE") and page number of the Record on Appeal. The defendant is incarcerated pursuant to the sentence imposed by the District Court in this matter.

### Course of Proceedings and Disposition in the District Court

On August 25, 2021 Geno St. Flerose was charged by Superseding Indictment in this case with Count 1, Murder in Aid of Racketeering Activity in violation of 18 U.S.C. § 1959(a)(1); Count 2, Discharge of a Firearm in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Count 3, Causing the Death of a Person in the Course of a violation of 18 U.S.C. § 924(c)(1)(A) and j)(1); Count 4, Possession of a Firearm and Ammunition by a Convicted Felon in violation of 18 U.S.C. § 922(g); Count 5, Assaulting, Resisting or Impeding Certain Federal Employees in violation of 18 U.S.C. §§ 111(a)(1) and (b); Count 6, Discharge of a Firearm in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Count 7, Possession of a Firearm and Ammunition by a Convicted Felon in possession of a firearm in violation of 18 U.S.C. § 922(g); Count 8, Conspiracy to Commit Access Device Fraud in violation of 18 U.S.C. § 1029(b)(2);

Count 9, Possession of Fifteen or More Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3); Counts 10 & 11, Aggravated Identify Theft in violation of 18 U.S.C. § 1028A(a)(1); Count 12, Possession of Fifteen or More Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3); Counts 13 & 14, Aggravated Identify Theft in violation of 18 U.S.C. § 1028A(a)(1); Count 15, Possession of Ammunition by a Convicted Felon in violation of 18 U.S.C. § 922(g); Count 16, Possession of Fifteen or More Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3); Counts 17 & 18, Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1); Count 19, Possession of Fifteen or More Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3); Count 20, Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1); Count 21, Possession of Fifteen or More Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3); and, finally, Counts 22 & 23, Aggravated Identify Theft in violation of 18 U.S.C. § 1028A(a)(l), (DE: 48).

The maximum penalty for the offense charged in Count 1 is death.

On January 24, 2023, the government filed its Notice of Intent NOT to Seek the Death Penalty. (DE: 71).

On August 23, 2023, after evaluations were performed on Mr. St. Flerose, the defense did not contest competency to stand trial, (DE: 77, 78, 79 & 86).

On January 8, 2024 the defense filed its Motion to Suppress Statements made to law enforcement officers by Mr. St. Flerose. (DE 88). On January 29, 2024 the district court held a hearing on the Motion to Suppress, after which the Motion was denied. (DE: 100 & 103).

After 7 days of trial, Mr. St. Flerose was convicted of all charges in the Superseding Indictment. (DE: 113, 120).

On May 3, 2024 Mr. St. Flerose was sentenced to Life as to Count 1s & Count 3s to run concurrently with each other; 120 months as to Counts 2s & Count 6s, to run consecutive to each other and all other counts; 60 months as to Count 4s, Count 5s Count 7s Count 8s, Count 9s, Count 12s, Count 15s, Count 16s, Count 19s, and Count 21s all to run concurrently to each other and to all other counts; 24 months as to Count 10s, Count 11s, Count 13s, Count 14s, Count 17s, Count 18s, Count 20s, Count 22s, and Count 23s, all to run concurrently with each other, and consecutive to all other counts, to be followed by a term of Supervised Release. (DE: 135)

On May 8, 2024, Mr. St. Flerose timely filed his Notice of Appeal from the Judgment and Commitment Order entered on May 3, 2024. (DE: 136).

Mr. St. Flerose remains in custody pursuant to the sentence imposed by the district court.

## Statement of Facts

The United States Secret Service (USSS) and the Federal Bureau of Investigation (FBI) conducted a joint investigation into the "77th Street Gang," also called "Uptown," also called "Every Body Eats," ("EBE"). The gang funded its activities largely through fraud, and that fraud affected interstate commerce. The gang used various access device fraud and wire fraud schemes to steal funds from victims. The group obtained personally identifiable information (PII), i.e. names, dates of birth, credit card numbers, bank account numbers, and social security numbers in various ways, including from the dark web and from robberies and burglaries. The PII is used a number of different ways, including but not limited to, credit card fraud. (DE: 149, 55-115)

The government's theory at trial was that the 77th Street Gang constituted an enterprise as defined in 18 U.S.C. § 1959(b)(2), The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, which included the following:

a. enriching the members and associates of the enterprise through, among other things, access device fraud and aggravated identity theft;

b. preserving and protecting the power, territory, and profits of the enterprise through the use of murder, assault, obstruction of justice, intimidation, violence, and

threats of violence;

c. promoting and enhancing the enterprise and its members' and associates' activities; and

d. keeping victims and witnesses in fear of the enterprise and in fear of its members and associates through threats of violence and actual violence. Thus, the above-described enterprise, through its members and associates, allegedly engaged in racketeering activity, as defined in 18 U.S.C. 1959(b)(1) and 18 U.S.C. 1961(1). (DE:48).

While investigating the criminal activities of the 77th Street Gang, the USSS and FBI identified the defendant, Gene St. Flerose a/k/a "Geno Ali" as one of its members and leaders. (DE:149, 71).

On August 10, 2018, law enforcement sought to search St. Flerose's residence located at 8057 NE 1st Avenue, Apt. 2, in Miami. Geno St. Flerose consented to the search of his home. Found within the home were a number of false credit cards and notebooks containing personal identifying information (PII), including names, dates of birth, bank account numbers, and social security numbers, of individuals not associated with the residence of St. Flerose. Police officers confirmed that the PII belonged to legitimate victims throughout South Florida. The cover of one of the composition books had St. Flerose's nickname printed on the front cover. (DE:147,

25-30, DE:150, 75-86).

Following the search, St. Flerose was transported to the Miami-Dade Northside Police Station, in Miami. During his post-Miranda interview, St. Flerose stated that he purchased the PII from a "dark web" website. He further advised that he paid for the PII with his credit card and was charged $4.00 for each set of information. St. Flerose said he had no direct relationship with the victims, nor had he ever met them. In addition, St. Flerose admitted to owning the composition books, along with the contents contained within. He also stated that the PII was old and that the list was from "a couple years ago." (DE:147, 20-21).

On April 16, 2019, a traffic stop was conducted on the vehicle St. Flerose was driving. An inventory of the vehicle revealed a Florida driver's license in the center console that did not belong to Geno St. Flerose. (DE:147, 25-30).

On May 14, 2019, a federal search and seizure warrant was obtained for the two cellphones seized from the vehicle. The search of St. Flerose's cellphones revealed a large amount of PII, including dates of birth, social security numbers, and credit card numbers belonging to other individuals. (DE:149, 15-55).

On the evening of June 17, 2020, FBI Special Agent Andrew Nelson was performing a surveillance operation in an effort to investigate the 77th Street Gang. Around 10:00 p.m., the agent drove by the Geno St. Flerose's residence in his

government issued Ford Fusion. As the FBI agent drove by, he observed St. Flerose and an individual identified as R.C. in the driveway of the residence. The agent later drove by the address again going in the opposite direction. As the agent began to make a right turn on Northeast 82nd Street, he observed an individual run towards him from the direction of his residence, raise his right arm and fire at least four rounds from a firearm, striking his vehicle multiple times. Agent Nelson was not struck by any rounds. (DE: 147, 30-48).

Later that evening, St. Flerose was contacted by law enforcement and agreed to be interviewed. St. Flerose also provided verbal and written consent to search his cellphone. During that interview, St. Flerose said that his friend R.C. had done the shooting. St. Flerose stated R.C. noticed the Ford Fusion circle the block multiple times and believed it was a "rival Op" (opposing gang member), so R.C. shot at the fusion. Further, St. Flerose disclosed that an associate of theirs had been shot and killed the day before, and he and R.C. were on edge as a result. (DE:147, 25-30).

While law enforcement was on scene, they recovered five spent 9 mm shell casings. (DE:148, 1-22).

On July 8, 2020, after further investigation, St. Flerose was again contacted and consented to another interview with FBI agents. In a nine-and-a-half-hour audio and video recorded statement, St. Flerose admitted that he was the individual who fired the

shots at the Ford Fusion being driven by the FBI agent on June 17, 2020. St. Flerose recalled that he was standing in front of his residence with R.C., when R.C. pointed out the Ford Fusion coming back past his residence. R.C. thought the car contained members of a rival gang. St. Flerose explained that he ran towards the car and fired multiple shots from a Glock 26 handgun. St. Flerose acknowledged that when he shot at the car, it was stopped at a stop sign, he did not see into the car, the windows were not being rolled down, and he did not see any firearms sticking out of the car. (DE:150, 87-116).

During a break in the interview, while agents were out of the room, St. Flerose called someone and asked them to remove a firearm from his home. Law enforcement responded to his residence and received consent to search. Inside, law enforcement located the Glock 26 handgun and seized it. (DE:151, 50-55).

St. Flerose admitted that the Glock 26 was the firearm used to shoot at the Ford Fusion. Additionally, during the search law enforcement recovered a box containing 14 rounds of Sellier and Bellot 7.62 caliber ammunition.

The gang investigation also revealed that on April 28, 2020, an individual with initials E.F. was killed by gunfire during a high speed chase. (DE:152, 50-56).

On July 8, 2020, during an interview with agents, St. Flerose admitted to this shooting and killing of E.F. on April 28, 2020. According to St. Flerose, in the spring

of 2020, he returned to his home and saw two individuals hiding nearby who he thought were waiting to attack him. One of those two individuals was E.F. St. Flerose advised that he fired shots at E.F. and the other individual but they escaped. Sometime later, on April 28, 2020, St. Flerose was in a vehicle when he observed E.F. in another vehicle. St. Flerose stated he chased E.F. and fired shots from the Glock 26 at E.F. It was later determined that E.F. died from the injuries he sustained in this shooting. (DE:152; 56-71).

Law enforcement responded to the scene of the April 28th shooting and recovered 13 shell casings, which were matched to ammunition recovered from St. Flerose's residence on June 16, 2019.

A subsequent ballistics analysis also confirmed that the bullets involved in the agent-related shooting, were fired by the same gun as bullets that were involved in the murder of E.F. on April 28, 2020, the Glock 26 seized from St. Flerose's home on July 8, 2020. (DE:150, 5-33). (DE:152; 13-50).

The government proved at trial that Geno St. FLerose possessed the firearm and ammunition between April 28, 2020, and June 18, 2020, and that he had previously been convicted of three separate felonies and that therefore, his possession of that firearm violated the law.

Geno St. Flerose moved to suppress his nine and a half hour recorded statement

that he made to the F.B.I. based on the subtle suggestions, and implicit promises of leniency by law enforcement agents. Because he was led to believe that he could work alongside law enforcement, in the capacity of a confidential source and that he might not be arrested or charged. (DE;88).

The following exchanges took place during the testimony of Special Agent Carsten during the suppression hearing:

> Q. Would it be fair to say that, based on the representations you made about telling him about reduced time, reduced sentences in exchange for cooperation, and then posing the prospect of him -- the granddaddy of them all, becoming a confidential source, that Geno wanted to go that route? Yes?
>
> A. I think it was pretty clear that he indicated he wanted to
> cooperate with the Government, yes.
>
> Q. Uh-huh. And then, in fact, you started giving him -- he --strike that. After you posed the prospect of him becoming a confidential source and working with the FBI, he became -- he asked questions about his safety, did he not?
>
> A. Yes, he did.

(DE:146, 81)

The testimony continued:

> Q. Page 153, Agent, Geno says: "Is there training for this or something?" And

you say: "There is not -- well, there is," and you say: "But it's informal and it's with me. The good news is this isn't my first" -- does that refresh your recollection as to whether or not Geno was asking about training because now he believed he was a confidential source with the FBI?

A. It is correct that he asked about training.

(DE:146, 83)

Q. I'm referring to Page 138 at the top. You see that at the top, Geno says: "It's a possibility I can be a paid CI?" And you say: "Yeah. And there -- it's actually quite lucrative. You can do quite well at that, actually." And Geno says: "No. I will." And you say: "It's a great second career." Remember that? Does that refresh your recollection?

A. I do. We were discussing the possibility of cooperation after having served a sentence and been released from custody specifically.

Q. In fact, you gave him an example of an individual who had been a paid CI for almost 25 years?

A. That is correct.

(DE:146, 83)

Additionally:

Q. At the top, Geno says: "How long -- well, how soon we getting into this,"

and you say: "So it starts from this moment forward." Does that refresh your memory as to what you responded to Geno with?

A. Yes. I made that sentence.

(DE:146, 87)

Q. And then, when you did end the statement, correct me if I'm wrong, but you then told Geno for the first time that he was under arrest?

A. That is correct. Yes. I informed him when he was under arrest.

Q. And he said: "I thought I wasn't getting arrested."

A. I couldn't say exactly what he said, but he was -- he did express surprise that he was going to be placed under arrest. Yes.

(DE:146, 90).

## STANDARD OF REVIEW

This Court reviews de novo the District Court's legal conclusions and its findings of fact for clear error. *United States v. Hollis*, 780 F.3d 1064, 1068 (11th Cir. 2015). The Court must review the entire record in the light most favorable to the prevailing party. *Id.* The voluntariness of a confession is a question of law, so it is subject to de novo review. *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003). The Court evaluates voluntariness under the totality of the circumstances. *Id*.

.

## SUMMARY OF THE ARGUMENT

A confession is voluntary if "it is the product of the defendant's free and rational choice." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). It may "not be extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." Id. This Court has stated that "even a mild promise of leniency" can "undermine the voluntariness of a confession…." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).

In this case, Geno St. Flerose's free and rational choice was undermined by law enforcements suggestions that he could possibly avoid arrest in this case by becoming a paid informant or possibly obtain a reduced sentence based on cooperation with the government as an informant.

Based upon the totality of the circumstances, this Court should find that Mr. St. Flerose's statements were involuntary and should have been suppressed and this matter should be remanded for a new trial.

## ARGUMENT AND CITATIONS OF AUTHORITY

**Based upon the totality of the circumstances, this Court should find that Geno St. Flerose's statements to law enforcement were involuntary and should have been suppressed.**

Custodial interrogation consists of questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of their freedom in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444(1966). First, the movant must have made his statements while under the custody of law enforcement officers, and second, the movant must have made the statements in response to interrogation by government agents. Id.

A person is in custody if a reasonable person in the same situation would not feel free to terminate the interrogation. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Subtle psychological coercion, either by promise of leniency or indirect threat, may render a confession involuntary. *United States v. Tingle*, 658 F.2d 1132, 1335 (9th Cir. 1981).

Here, the St. Flerose was brought to the FBI office on July 8, 2020, after initially speaking with law enforcement out in the field about a shooting he was involved in a couple of weeks prior. The St. Flerose was the main suspect in shooting into an unmarked vehicle that was being driven by an undercover FBI

Agent in front of the St. Flerose's house. Prior to this time, the FBI had been conducting extensive investigation and background into St. Flerose, suspecting him of being involved in numerous fraudulent activities as well as being associated with a street gang, known as EBE (Everybody Eats) and suspected of several gang-related shootings. While St. Flerose was not formally arrested and placed in handcuffs when police first made contact, he was otherwise in the custody of law enforcement and not free to leave. He was surrounded by officers, picked up and driven to the FBI office, and then escorted into a small interrogation room. The interrogation was audio and video recorded

Based upon the totality of these conversations, the subtle suggestions, and implicit promises of leniency, St. Flerose was led to believe that he can work alongside law enforcement, in the capacity of a confidential source and that he may not be arrested or charged, and if he is, he will be conferred a major benefit and likely will not do much time in prison.

During the suppression hearing, the following exchanges took place during the cross-examination of Special Agent Carsten:

Q. Would it be fair to say that, based on the representations you made about telling him about reduced time, reduced sentences in exchange for

cooperation, and then posing the prospect of him -- the granddaddy of them all, becoming a confidential source, that Geno wanted to go that route? Yes?

A. I think it was pretty clear that he indicated he wanted to cooperate with the Government, yes.

Q. Uh-huh. And then, in fact, you started giving him -- he --strike that. After you posed the prospect of him becoming a confidential source and working with the FBI, he became -- he asked questions about his safety, did he not?

A. Yes, he did.

(DE:146, 81)

The testimony continued:

Q. Page 153, Agent, Geno says: "Is there training for this or something?" And you say: "There is not -- well, there is," and you say: "But it's informal and it's with me. The good news is this isn't my first" -- does that refresh your recollection as to whether or not Geno was asking about training because now he believed he was a confidential source with the FBI?

A. It is correct that he asked about training.

(DE:146, 83)

Q. I'm referring to Page 138 at the top. You see that at the top, Geno says: "It's a possibility I can be a paid CI?" And you say: "Yeah. And there -- it's actually quite lucrative. You can do quite well at that, actually." And Geno says: "No. I will." And you say: "It's a great second career." Remember that? Does that refresh your recollection?

A. I do. We were discussing the possibility of cooperation after having served a sentence and been released from custody specifically.

Q. In fact, you gave him an example of an individual who had been a paid CI for almost 25 years?

A. That is correct.

(DE:146, 83)

Additionally:

Q. At the top, Geno says: "How long -- well, how soon we getting into this," and you say: "So it starts from this moment forward." Does that refresh your memory as to what you responded to Geno with?

A. Yes. I made that sentence.

(DE:146, 87)

Q. And then, when you did end the statement, correct me if I'm wrong, but you then told Geno for the first time that he was under arrest?

A. That is correct. Yes. I informed him when he was under arrest.

Q. And he said: "I thought I wasn't getting arrested."

A. I couldn't say exactly what he said, but he was -- he did express surprise that he was going to be placed under arrest. Yes.

(DE:146, 90).

St. Flerose asserts that the nine-and-a-half-hour statement he made on July 8, 2020 was involuntarily obtained from him in violation of the Fifth Amendment. *Mincey v. Arizona*, 437 U.S. 385, 398 (1977).

The government must prove, in addition to formal compliance with *Miranda* that any incriminating statement obtained from St. Flerose was given voluntarily. The final test of admissibility is always the entire course of police conduct leading to the statement. *Jackson v. Denno*, 378 U.S. 368, 376 (1964). No single factor is determinative on the issue of voluntariness. Rather the Court must look to the "totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) and *Mincey*, 437 U.S. at 401.

The Government bears the burden of demonstrating by a preponderance of the evidence that a suspect's statements were voluntarily made. *Missouri v. Seibert*, 542 U.S. 608 n.1 (2004).

"Promises of leniency are `relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced.'" *United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020) (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997), overruled on other grounds by *Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007)).

The test applicable to claims of coercion via offers of leniency is set out in *United States v. Garot*:

> First, was an express or implied promise of lenience made to St. Flerose? Secondly, if no promise of lenience was made, did St. Flerose reasonably believe that such a promise had been made? Thirdly, if a promise was made or if St. Flerose reasonably believed that a promise had been made, was his statement induced by that promise in a "but for" sense? Fourthly, if a promise was made or if St. Flerose reasonably believed that a promise had been

> made, and this promise or belief induced his statement in a "but for" sense, was the inducing promise coercive?

801 F.2d 1241, 1244-45 (10th Cir. 1986) (internal brackets and quotation marks omitted).

The Tenth Circuit has characterized the test as ultimately asking whether the St. Flerose was "so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *United States v. Rodebaugh*, 798 F.3d 1281, 1293 (10th Cir. 2015) (internal quotation marks omitted). The test may also be understood as asking whether "a promise of leniency . . . was sufficiently compelling and linked to the confession so that it could be said that St. Flerose 's will was overcome by the offer." *Clanton*, 129 F.3d at 1159. In resolving this matter, the court must consider the totality of the circumstances, including both St. Flerose 's personal characteristics and the circumstances of the interrogation. *Id*. at 1291.

Based upon the “totality of the circumstances” it is clear from a review of the interrogation that St. Flerose was sold hook, line, and sinker on the idea of working alongside the FBI in order to possibly avoid arrest in this case or in exchange for a significant reduction of any penalties he may face. The

statements made by St. Flerose should not have been deemed admissible and the statement should have been suppressed.

As the Supreme Court stated *Jackson*, 378 U.S. at 385-386:

> It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' *Blackburn v. Alabama*, 361 U.S. 199, 206-207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, and because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' *Spano v. New York*, 360 U.S. 315, 320-321, 79 S.Ct. 1202, 1205- 1206, 3 L.Ed.2d 1265.

When an agent commences to solicit testimony that is inextricably linked to the length of sentence a person will receive, free will is no longer a factor in any decision. Voluntariness is no longer available. When the choice is talk to be or be sentenced to a longer imprisonment there is no choice. When the agent raises his hand to demonstrate the imposition of a lengthy sentence and successively lowers it to demonstrate less time the more the defendant reveals which the agent wants to hear, few, indeed, can resist such an illusion. Again, as noted in *Denno*, at 389:

> '(T)his Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion." *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279.

The improper and illegal techniques of the interrogation in this case should have resulted in the suppression of the statements at trial. Because the

statements made by the Defendant were clearly an attempt to curry favor and to "buy down" his future sentence the admissions themselves are suspect.

A confession is voluntary if "it is the product of the defendant's free and rational choice." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). It may "not be extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Id*. This Court has stated that "even a mild promise of leniency" can "undermine the voluntariness of a confession." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).

## CONCLUSION

Based upon the totality of the circumstances, this Court should find that Mr. St. Flerose's statements were involuntary and should have been suppressed and this matter should be remanded for a new trial.

Respectfully submitted,

By: *Hector L. Flores*

Hector L. Flores
Attorney for Appellant
40 NW Third Street, Penthouse 1
Miami, Florida 33128
Telephone (305) 374-3998

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the Word program on which it is written, the numbered pages of this brief contain 5,662 words.

*Hector L. Flores*
Hector L. Flores

## CERTIFICATE OF SERVICE

I CERTIFY that a copy of the foregoing was served electronically this 25th day of March, 2025, upon Daniel Matzkin, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132-2111.

*Hector L. Flores*
Hector L. Flores